IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
*Plaintiff*,

v.                                                    Civil Action No. ELH-19-1651

GREYHOUND LINES, INC.,
*Defendant*.

**MEMORANDUM OPINION**

In this employment discrimination action, the United States Equal Employment Opportunity Commission ("EEOC") filed suit against Greyhound Lines, Inc. ("Greyhound"), a provider of intercity bus transportation. The EEOC asserts a claim of failure to provide religious accommodation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). ECF 1 (the "Complaint").

The suit arises from the hiring process of Aliyah Hadith, an observant Muslim woman. It is undisputed that in 2017, Greyhound extended a conditional offer of employment to Hadith, who was a bus driver in training. But, Greyhound officials informed Hadith that, while on the job, she would not be permitted to wear an untucked shirt or a loose-fitting, floor-length garment, called an abaya. After learning of Greyhound's clothing requirement, Hadith withdrew from Greyhound's bus driver training program. The EEOC alleges that Greyhound's stance regarding Hadith's attire amounted to an unlawful denial of religious accommodation and resulted in a constructive discharge.

Plaintiff seeks damages and injunctive relief. With respect to the latter, it asks for a permanent injunction enjoining Greyhound from engaging in religious discrimination and ordering defendant to institute policies and programs against religious discrimination. *Id.* at 5-6.

Defendant has moved for summary judgment (ECF 52), supported by a memorandum of law (ECF 52-1) and exhibits (collectively, the "Motion"). Plaintiff opposes the Motion. ECF 55. The opposition is supported by exhibits. Greyhound replied. ECF 56.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I. Background[1]

### A.

Hadith was raised in a practicing Sunni Muslim family. ECF 52-6 (Hadith Dep.) at 3 (Tr. at 14).[2] Prior to becoming Sunni Muslims, Hadith's parents were adherents or members of the Nation of Islam. ECF 55-1 (Hadith Dep.) at 8 (Tr. at 31). They were not "strict" with Hadith and her sisters in their adherence to, or enforcement of, Islamic practices regarding attire for women. *Id.* At some point, around 2011 or 2012, Hadith became more observant than her parents. *See id.* at 3-5 (Tr. at 14-17). She "start[ed] dressing more traditionally Muslim." *Id.* at 6 (Tr. at 18).

The evidence regarding the religious practices of observant Sunni Muslims, and in particular, practices related to clothing, comes from the deposition testimony of Hadith, as well as

---

[1] The facts are taken from the parties' exhibits, viewed in the light most favorable to plaintiff as the nonmoving party. Throughout the Opinion, I cite to the electronic pagination. It does not always correspond to the pagination that appears on the parties' submissions.

[2] Both sides have submitted partial transcripts of Hadith's deposition, which contain different excerpts from the full transcript. *Compare* ECF 52-6 (submitted by defendant) *with* ECF 55-1 (submitted by plaintiff). I cite to both exhibits.

that of Christopher Boone, Hadith's husband at the relevant time, and Hadith's Declaration.  ECF 55-4.[3]  Hadith and Boone married in January 2016 and divorced in 2020.  ECF 52-6 at 19 (Tr. at 52).  Boone is also a practicing Muslim.  *See* ECF 55-2 (Boone Dep.) at 6 (Tr. at 36).

According to Hadith, Sunni Muslim women must adhere to certain dress requirements when outside of the home. Specifically, they must wear a hijab, *i.e.*, a "head scarf," ECF 52-6 (Hadith Dep.) at 23 (Tr. at 91), as well as a "dress" or "overgarment," called an abaya.  *Id.* at 7 (Tr. at 25).   She averred that these requirements derive from the texts produced by Islamic "scholars" who "stud[ied] and interpret[ed]" the Koran.  ECF 55-1 (Hadith Dep.) at 12 (Tr. at 47). According to both Hadith and Boone, wearing an abaya demonstrates modesty.  ECF 55-1 (Hadith Dep.) at 9 (Tr. at 42); *see* ECF 55-2 (Boone Dep.) at 5 (Tr. at 35).

An abaya must be "loose," that is, "it can't hug your body."  ECF 55-1 (Hadith Dep.) at 12 (Tr. at 47).  And, it must extend all the way to a wearer's feet or cover the feet.  *Id.* at 9-11 (Tr. at 42, 45-46).  Pants can be worn underneath the abaya.  ECF 52-6 (Hadith Dep.) at 10 (Tr. at 33). Boone explained, in relevant part: "Nothing should be showing. . . .  [T]heir bosom . . . and their backside should be totally covered to the point where you can't see movement, so that men can't lust after their bodies."  ECF 55-2 (Boone Dep.) at 5 (Tr. at 35).

Hadith acknowledged that some practicing Sunni Muslim women do not wear a hijab or abaya, which she characterized as "their choice."  ECF 52-6 (Hadith Dep.) at 9 (Tr. at 32). Nevertheless, she maintained that wearing an abaya is a "requirement."  *Id.*  She explained, by analogy, that even though "drinking alcohol is not allowed" in Islam, some Muslims do so.  *Id.* But, in her view, "that's between them and Allah."  *Id.*

---

[3] I discuss the dispute regarding the Declaration, *infra*.

In 2015 or 2016, about four or five years after becoming more observant, Hadith began wearing a hijab and a floor-length skirt or an abaya.  *See id.* at 6, 13 (Tr. at 18, 45).  She explained: "I just started taking my life serious[ly].  I was born Muslim, and I told myself I want to die Muslim . . . .  [T]hat was my decision."  *Id.* at 6 (Tr. at 18). Sometime thereafter, she "transitioned" from wearing a long skirt to only wearing an abaya.  *Id.* at 13 (Tr. at 45).

According to Hadith, in Sunni Islam a woman's husband is "responsible for [her] clothing," although he does not "dictate[]" what she must wear.  ECF 55-1 (Hadith Dep.) at 13 (Tr. at 50). While Boone and Hadith were married, Boone would sometimes "allow" Hadith to wear jeans, a "long sweater," and boots or sandals outside of the house, when they went out for "date night." ECF 52-6 (Hadith Dep.) at 19, 20 (Tr. at 52, 55).

Hadith had a long-time interest in becoming a driver for Greyhound. ECF 55-1 (Hadith Dep.) at 32 (Tr. at 149).  She explained: "I just love to travel.  I like to drive.  So why not get paid to do both."  *Id.*  In 2015 or early 2016, she was working at a "call center."  *Id.* at 28 (Tr. at 135). Sometime during that period, she applied for employment with Greyhound and participated in an interview, although it is not clear what position she applied for or how far she made it in the application process. *See id.* at 29 (Tr. at 136).

 In 2016, Hadith decided to pursue her interest further and embarked on a career change. *Id.* at 28 (Hadith Tr. at 135).  Together with Boone, Hadith enrolled in truck driving school to obtain her Commercial Driver's License ("CDL"), hoping eventually to secure employment as a Greyhound bus driver.  *Id.* at 28, 32 (Hadith Tr. at 135, 149); s*ee* ECF 55-2 (Boone Dep.) at 22 (Tr. at 115).  Hadith obtained her CDL in December 2016.  ECF 55-1 (Hadith Dep.) at 25 (Hadith Tr. at 118). It seems that Hadith then worked for a trucking company called Western Express for

about four months, and then gained employment with a trucking or transportation company called GTR Transport, for which she worked until December 2017.  *Id.* at 26 (Hadith Tr. at 125).

Boone testified that in "driver training school," he and Hadith "drove" or "rode" in the same truck.  ECF 55-2 (Boone Dep.) at 21 (Tr. at 114).  And, he learned that safety is the core "responsibility of a trucker" or, in other words, "what it's all about."  *Id.* at 23 (Tr. at 116).  The instructors at the program did not have any safety concerns regarding Hadith's clothing.  *See id.* In addition, Boone averred that for some period of time before Hadith applied to work for Greyhound, he and Hadith "drove" together for one or both of Hadith's employers.  *Id.* at 22 (Tr. at 115).  Boone estimated that together they logged more than 50,000 miles and traveled to forty-two states, often driving through "heavy traffic."  *Id.* at 23-24 (Tr. at 116-17).  During that time, Boone observed that while Hadith drove, she would "pull [her abaya] up gently, maybe an inch or two, to make sure that it didn't get caught on things . . . if necessary." *Id.*  According to Boone, Hadith's abaya never got "caught in the pedals of the truck."  *Id.*  Similarly, wearing an abaya never interfered with "pre-trip inspections" (id. at 23 (Tr. at 116)), and Hadith never had any issues entering and exiting a truck while wearing an abaya.  *Id.* at 22 (Tr. at 115).

On November 3, 2017, Hadith applied to Greyhound for employment as a bus driver.  *See* ECF 55-1 at 54.[4]  At the time, she was earning $1,800 per week for GTR Transport.  ECF 55-1 (Hadith Dep.) at 32 (Tr. at 149).  Hadith did not recall what the entry level salary of a Greyhound driver was or whether it was more or less than what she earned at GTR Transport.  *See id.*  In her words, "I was chasing what made me happy and what I wanted to do."  *Id.*  After her short-lived

---

[4] ECF 55-1 contains the portions of Hadith's deposition transcript submitted by plaintiff as well as other materials, including Hadith's application to Greyhound.

training period with Greyhound, described *infra*, Hadith returned to the trucking industry. *See* ECF 55-4 (Hadith Dec.), ¶¶ 4-6.

Hadith avers that as of January 27, 2021, she had "driven a semi-truck at least 800,000 miles on U.S. highways while wearing an abaya"; she has never "been in an accident"; and wearing an abaya has never interfered with driving a truck, entering and exiting a truck, or inspecting the truck. *Id.* ¶¶ 6-7.

**B.**

According to Greyhound's "Employee Handbook," Greyhound is "the largest intercity bus company in North America." ECF 52-2 at 5.[5] Greyhound "carries more than 20 million customers a year to 3,800 destinations in the U.S. and Canada." *Id.*

Greyhound's Employee Handbook includes a "Personal Appearance and Demeanor Policy." ECF 52-5 at 32-34. It requires both bus drivers and student drivers to wear a uniform, although the dress requirements for the two groups differ. *Id.* at 34. Gerrod Norman, Greyhound's Regional Human Resources Manager for the "northeast," testified to the uniforms' requirements. ECF 52-5 (Norman Dep.) at 3 (Tr. at 11).

The "standard training uniform" consists of "a white shirt" and "black pants," among other things. *Id.* at 10 (Tr. at 37). The "standard uniform" for drivers consists of "gray pants, a blue shirt, a red tie, a gray jacket and a gray cap." *Id.* at 10-11 (Tr. at 37-38). According to Mark Taylor, a Greyhound manager, the driver uniform has a safety function: a driver's uniform does not "hang . . . on the ground" or have any "loose ends," so no part of it "can potentially be snagged and lead to an injury." ECF 52-8 (Taylor Dep.) at 4 (Tr. at 36); *see* ECF 52-2 at 86 (EEOC's

---

[5] According to the Declaration of Eunju Park, defense counsel, ECF 52-2 contains, among other things, excerpts of defendant's Employee Handbook. *See id.* at 2. Greyhound has also submitted other excerpts of the Employee Handbook in other exhibits, which I cite, *infra*.

responses to defendant's first set of interrogatories, indicating Taylor's position).  The tie in the driver's uniform must be clip on, so that "if anything . . . tug[s] on it, it comes right off."  ECF 52-8 (Taylor Dep.) at 4 (Tr. at 36).

Greyhound's Employee Handbook also addresses religious accommodations.  ECF 52-5 at 44.  Consistent with Title VII, discussed *infra*, Greyhound "will attempt to make reasonable accommodations for . . . sincerely held religious beliefs unless doing so would cause an undue hardship on [Greyhound's] operations" or "interfere with the applicant or employee's ability to perform the essential functions of his/her position."  *Id.*

## C.

As noted, Hadith applied to Greyhound for employment on November 3, 2017.  Greyhound has a multi-phase hiring process, which is described in the job description docketed at ECF 52-6 at 51-55.   In Phase I, applicants must demonstrate they possess a CDL and pass a "computer based" test, among other things.  *Id.* at 53.  Applicants who satisfy the Phase I requirements are "given the opportunity to accept a spot at the [Greyhound] driving school."  *Id.*  In Phase II, trainees spend two weeks at training school, where they receive classroom instruction and behind-the-wheel training.  *Id.* at 54.  Phase III, also known as "Finishing School," lasts for about three weeks and involves additional testing and time behind the wheel.  *Id.*

Jehu Remy, a Greyhound "Supervisor of Driver Operations and Safety" (ECF 52-2 at 86), interviewed Hadith at Greyhound's "Baltimore terminal" on November 10, 2017.  ECF 55-3 (Remy Dep.) at 6 (Tr. at 46).  Hadith wore a black abaya and a hijab. *Id.* at 7 (Tr. at 48). Remy testified that, based on Hadith's application and her performance during the interview, Remy extended a "conditional offer of employment."  *Id.* at 8 (Tr. at 49).  Later in his deposition, he

added that Hadith had "met the requirement to actually begin the hiring process." *Id.* In any event, it is undisputed that Hadith advanced to Phase II of the hiring process, as described *infra*.

With respect to other details, Hadith's and Remy's accounts of the interview differ. According to Remy, Hadith asked whether she would be able to obtain an accommodation in the form of an exemption from the requirements of the driver's uniform. *See id.* at 9 (Tr. at 54). Further, Remy testified that he informed Hadith that Greyhound "does offer accommodation for religious beliefs" and that he would share the relevant information with her "during the course of the hiring process." *Id.* at 10 (Tr. at 55). On his account, he intended to "reach out to [his] superiors and get information for her. . . ." *Id.*

In contrast, Hadith testified that she and Remy discussed her attire and a potential religious accommodation at the initial interview and during "several" subsequent conversations, before she advanced to Phase II of the hiring process. ECF 55-1 (Hadith Dep.) at 14 (Tr. at 80). According to Hadith, during the interview she asked Remy whether she would be "accept[ed] . . . in training" while wearing an abaya. *Id.* at 15 (Tr. at 81). Remy responded that Greyhound would "have a religious waiver waiting for [Hadith]" if, or when, she advanced to the next phase of the hiring process. *Id.* at 14 (Tr. at 80).

Remy allegedly assured Hadith that she would "be allowed" to depart from the uniform policies. ECF 55-1 (Hadith Dep.) at 50 (Tr. at 190). On one occasion, either during the interview or in a subsequent conversation, Hadith expressed concern about the uniform policy, and suggested that during training she could wear an abaya "with the white shirt and black bottom already connected." *Id.* at 15 (Tr. at 81). According to Hadith, Remy responded: "'No worries. . . . No, you're fine. Just go [to training] the way you are.'" *Id.* at 15 (Tr. at 81). In Hadith's view, she

"walked away from [her] job" to pursue employment with Greyhound, which she "would have never done" but for Remy's assurances.  *Id.* at 50 (Tr. at 190).

As of December 3, 2017, Hadith was cleared to advance to Phase II of Greyhound's driver training, which entailed completing a two-week training program in Atlantic City, New Jersey.  *See* ECF 52-7 at 28 (Remy email correspondence).  Shortly before Hadith boarded a Greyhound bus in Baltimore to take her, and presumably other trainees, to Atlantic City, Hadith asked Remy: "'I don't look like everybody else.  Are you sure I'm going to be accepted when I get to New Jersey?'"  ECF 55-1 (Hadith Dep.) at 33 (Tr. at 159).  According to Hadith, Remy replied: "Yeah. They already know you're coming. When you get there, sign this religious waiver and you'll be fine.'"  *Id.*  But, it seems that Remy did not actually provide Hadith with a waiver form at that time.  *See id.* at 51 (Hadith Tr. at 198).  Nor did Hadith receive one upon her arrival in Atlantic City that day.  *See id.*; *see* ECF 52-7 at 27-29 (Remy email correspondence).

The following day, an instructor at the training program in Atlantic City emailed Norman, the aforementioned Greyhound official, and another high-level company official about Hadith's attire.  *See* ECF 55-6 at 10-12 (email correspondence).  Specifically, the instructor's email stated, in relevant part: "Ms. Aliya Hadith, a Baltimore student is dressed as a Muslim.  Head covered, long black dress and black top.  No white shirt or black tie.  I have not discussed the uniform polic[y] with her."  *Id.* at 12.  As a Senior Regional Human Resources Manager, Norman is responsible for handling employee requests for religious accommodations.  *See* ECF 52-5 (Norman Dep.) at 6 (Tr. at 20).  Five minutes after receiving the instructor's email, Norman responded: "She must wear the uniform. We can do an accommodation for head covering, pants must be under the skirt with the skirt over the pants hitting below the knee.  White shirt/tie is to be worn.  The

accommodation must be in writing."  ECF 55-6 at 12 (email correspondence).  Shortly thereafter, Remy was dispatched to meet with Hadith at the training program.  *See id.* at 11.

The following day, December 5, 2017, Remy met with Hadith in Atlantic City.  ECF 55-3 (Remy Dep.) at 13 (Tr. at 77).  He informed Hadith of Greyhound's proposed accommodation.  *See id.*  Remy testified that he conveyed that as a trainee and a fully employed driver, Hadith would be allowed to wear a hijab, but she would have to "wear the uniform shirt" as well as a knee-level skirt, with the option of wearing "the uniform pants" beneath the skirt.  *Id.* at 15 (Tr. at 78).

According to Remy, he offered various justifications for Greyhound's proposal.   In particular, Remy explained that a long, flowing abaya would pose safety risks during routine pre-trip inspections, as the abaya could get "caught between the gear and the belt" while checking the engine, which was "something that [Greyhound] . . . [wa]s really concerned about."  *Id.* at 14 (Tr. at 78).  Moreover, Greyhound was concerned about Hadith's risk of tripping on her abaya in and around a bus.  *Id.*  Relatedly, Hadith testified that Remy also invoked the concern that the bottom of an abaya might slip under the bottom of a gas pedal or a brake pedal and interfere with Hadith's ability to drive safely. ECF 55-1 (Hadith Dep.) at 44 (Tr. at 179).  Notably, it is not clear whether Greyhound's proposed accommodation required the driver's shirt to be tucked in or, alternatively, whether defendant would have tolerated an untucked shirt; neither side's briefs, nor the excerpts of the pertinent deposition transcripts, appear to address the issue.

According to Hadith, during that meeting Remy also specified that the skirt could not be "loose fitting."  *Id.* at 21 (Tr. at 107).  To Hadith, this condition was directly contrary to her reasons for seeking an accommodation, which she had previously conveyed to Remy and, in her view, were met with approval.  *See id.* at 21-22 (Tr. at 107-08).  She testified that during her conversation with Remy, she told him, referencing her abaya: "We discussed this already, and you told me I

could wear this." *Id.* at 22 (Tr. at 108).  In contrast, Remy recalled that Hadith initially agreed to the proposed accommodation, before subsequently calling her husband to discuss the proposal and then changing her mind.  *See* ECF 55-3 (Remy Dep.) at 14-15 (Tr. at 78-79).

It is clear that, at some point during the meeting, Hadith called Boone.  *See id.*; ECF 55-1 (Hadith Dep.) at 22 (Tr. at 108); ECF 55-2 (Boone Dep.) at 20 (Tr. at 113).  Hadith recalled that she relayed the terms of Greyhound's proposal to her husband, who then told her that the decision of whether to accept the proposal was "'up to [her].'"  ECF 55-1 (Hadith Dep.) at 22 (Tr. at 108).  However, Hadith testified that she knew Boone's preference, even though he did not express his view aloud.  *See id.* at 38 (Tr. at 171).  She explained: "I had been married to him at that point for two years.  I knew what he requested of me.  I already knew."  *Id.*

The excerpt of Boone's deposition transcript submitted by the EEOC indicates that Boone recalled that Hadith passed her phone to Remy, and that Boone and Remy spoke directly.  *See* ECF 55-2 (Boone Dep.) at 20 (Tr. at 113).  But, the excerpt does not address the content of their conversation.  *See id.*

According to Remy, Hadith called Boone on the speakerphone and Boone asked Remy "what [Greyhound] was offering."  ECF 55-2 (Remy Dep.) at 15 (Tr. at 79).  Remy testified that Boone asked Hadith if she was "okay" with Greyhound's offer.  *Id.*  Further, Boone conveyed that it was "up to [Hadith] to make her decision," and that he did not "have any problem" with Greyhound's offer.  *Id.*  Remy recalled that he then stepped away to contact Norman and inform him that Hadith "had accepted [Greyhound's offer] while she was talking to her husband."  *Id.*  But, by the time Remy returned to Hadith, she had "changed her mind."  *Id.*

Hadith asserts that she countered Greyhound's offer with a proposal of her own.  Specifically, Hadith proposed that for the remainder of her training she would wear an untucked

11

white shirt over her abaya.  ECF 55-1 (Hadith Dep.) at 36 (Tr. at 169).   But, Remy rejected that proposal.  *Id.*  Hadith then offered to wear "the white shirt, not tucked in, with the black tie and a long skirt to [her] ankle."  *Id.*  In Hadith's view, that outfit would have allowed her to maintain modesty while "still [being] within the uniform."  *Id.*  However, Remy also rejected that proposal and asked Hadith: "'What are you going to do? Are you going to accept our terms?'"  *Id.* at 37 (Tr. at 170).  Hadith responded that she could not.  *Id.*  Remy then gave Hadith a "hardship paper," which she signed.  *Id.*  That concluded her participation in the Greyhound training program and hiring process.  *See, e.g.*, ECF 55 at 15.

Remy testified that Hadith did not propose an alternative accommodation.  ECF 52-7 (Remy Dep.)  22 (Tr. at 142).  And, he characterized Hadith's departure from the training program as a resignation.  ECF 52-7 (Remy Dep.) at 19 (Tr. at 93).

This suit followed.  Additional facts are included, *infra*.

## II.  Fed. R. Civ. P. 56

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

12

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v.*

*Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). That said, "a party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc*., 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co*., 499 F. App'x 285, 294 (4th Cir. 2012).

### III. Discussion

As indicated, the EEOC claims that Greyhound failed to provide Hadith with a reasonable accommodation for her bona fide religious belief and, consequently, subjected Hadith to a constructive discharge. First, I summarize the doctrine concerning such failure-to-accommodate claims under Title VII. Then, I explain why plaintiff has established a prima facie violation of

14

Title VII.  Last, I dispose of defendant's arguments that its proposed accommodation was reasonable and that Hadith's preferred accommodation would have constituted an undue burden on Greyhound's business operations.

### A.  Title VII Generally

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1); *see Young v. United Parcel Service, Inc.*, 575 U.S. 206, 135 S. Ct. 1338, 1344 (2015); *Roberts v. Glenn Industrial Group, Inc.*, __ F.3d__, 2021 WL 2021812, at *3 (4th Cir. May 21, 2021); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015).  Under Title VII, it is "unlawful" for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1).  The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  *Id*. § 2000e(j).  This definition "includes a requirement that an employer 'accommodate' an employee's religious expression."  *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017-18 (4th Cir. 1996); *see U.S. Equal Emp't Opportunity Comm'n v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008).

Generally, courts recognize "two theories in asserting religious discrimination claims."  *Chalmers*, 101 F.3d at 1017.  These are "denominated as the 'disparate treatment' and 'failure to accommodate' theories."  *Id.*  This suit concerns the latter.

To prevail on a prima facie failure-to-accommodate claim, an employee must establish that: "'(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" *U.S. Equal Emp't Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017) (quoting *Firestone*, 515 F.3d at 312) (alterations in *Consol Energy*), *cert. denied*, ___ U.S. ____, 138 S. Ct. 976 (2018). The rule for "claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions." *U.S. Equal Emp't Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015).

Notably, in contrast to a disparate treatment case, in "a religious accommodation case, an employee can establish a claim even though she cannot show that other (unprotected) employees were treated more favorably or cannot rebut an employer's legitimate, non-discriminatory reason for her discharge." *Chalmers*, 101 F.3d at 1018; *see Abeles v. Metro. Wash. Airports Auth.*, 676 F. App'x 170, 176 (4th Cir. 2017). To that end, "an employer must, to an extent, actively attempt to accommodate an employee's religious expression or conduct even if, absent the religious motivation, the employee's conduct would supply a legitimate ground for discharge." *Chalmers*, 101 F.3d at 1018.

"If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not accommodate the plaintiff's religious needs without undue hardship." *Chalmers*, 101 F.3d at 1019; *see Firestone*, 515 F.3d at 312 (noting that in religious accommodation cases, courts employ a burden-shifting framework similar to the one articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)); *see also* 42 U.S.C. § 2000e(j).

16

To satisfy its burden, the employer must demonstrate "'*either* (1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances or (2) that such accommodation was not provided because it would have caused an undue hardship—that is, it would have 'result[ed] in "more than a de minimis cost" to the employer.'" *Firestone*, 515 F.3d at 312 (quoting *Ansonia Bd. Of Educ. V. Philbrook*, 479 U.S. 60, 67 (1986)) (internal citation omitted)) (alterations and emphasis in *Firestone*).  In short, proving the reasonableness of the proposed accommodation or undue burden is sufficient to escape liability.  If an employer persuades the court that its proposed accommodation was reasonable, the court "need not examine" the undue burden claim. *Firestone*, 515 F.3d at 312.

The concepts of reasonable accommodation and undue hardship are not explicitly defined by Title VII.  Therefore, "the precise reach of the employer's obligation to its employee is unclear. . . . and must be determined on a case-by-case basis." *Beadle v. Hillsborough Cty. Sheriff's Dep't*, 29 F.3d 589, 592 (11th Cir. 1994); *see Tabura v. Kellogg USA*, 880 F.3d 544, 558 (10th Cir. 2018) ("Whether an employer will incur an undue hardship is a fact question . . . that turns on 'the particular factual context of each case.'") (internal citation omitted).

The Fourth Circuit has explained: "The [statute's] use of the terms 'reasonably' and 'undue hardship'. . . indicates that this is a field of degrees, not a matter for extremes. Both terms are 'variable ones,' dependent on the extent of the employee's religious obligations and the nature of the employer's work requirements." *Firestone*, 515 F.3d at 313 (citation omitted). In sum, the reasonable accommodation and undue hardship standards "ensure that while an employer must 'actively attempt to accommodate an employee's religious expression or conduct,'. . . it is not required to do so 'at all costs.'" *Firestone*, 515 F.3d at 314-15 (quoting *Chalmers*, 101 F.3d at 1018; *Philbrook*, 479 U.S. at 70)

Of relevance here, an accommodation constitutes an undue hardship if it would impose more than "a *de minimis* cost" on the employer. *Hardison*, 432 U.S. at 84. "Both economic and non-economic costs can pose an undue hardship upon employers." *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009). For instance, courts have found that non-economic costs such as damage to employee morale, compromise of a collective bargaining agreement or seniority system, or unequal treatment of other employees, can constitute undue hardships. *See, e.g.*, *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010); *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (5th Cir. 2000) (finding that "[t]he mere possibility of an adverse impact on co-workers as a result of 'skipping over' [an employee in a scheduling system] is sufficient to constitute an undue hardship") (citation omitted); *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (noting that an undue hardship may be present "where an accommodation would impose more than a de minimis impact on coworkers, such as depriving coworkers of seniority rights or causing coworkers to shoulder the plaintiff's share of potentially hazardous work"); *accord United States v. Bd. of Educ.*, 911 F.2d 882, 887 (3d Cir. 1990) (noting that the Supreme Court has suggested that "the undue hardship test is not a difficult threshold to pass") (citing *Hardison*, 432 U.S. 63). Additionally, the Fourth Circuit has found more than a minimal burden where an employee's religious need imposes "personally and directly on fellow employees" such as by "invading their privacy and criticizing their personal lives." *Chalmers*, 101 F.3d at 1021.

### B.  Plaintiff's Prima Facie Case

As noted, plaintiff's suit is predicated on the theory that Greyhound's failure to accommodate Hadith's religious beliefs resulted in a constructive discharge.  Greyhound does not dispute that the EEOC has satisfied two of the three elements of a prima facie case of failure to accommodate, namely, that Hadith had a bona fide religious belief that conflicted with

Greyhound's uniform policy, and that Hadith informed Greyhound of her belief.  *See* ECF 52-1 at 19.  But, defendant insists that the EEOC has not demonstrated that Hadith was subjected to an adverse employment action because she failed to comply with the uniform policy or to accept defendant's proposed accommodation.  *See id.*  According to Greyhound, Hadith was not constructively discharged, let alone disciplined.  *See id.*  Rather, she "voluntarily resigned from the training program."  *Id.*

### 1.

A claim of constructive discharge arises when an employee resigns because the "circumstances of discrimination" made the employee's working conditions "'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Green v. Brennan*, 578 U.S. ___, 136 S. Ct. 1769, 1776 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)).  To establish a claim of constructive discharge, a claimant "must prove first that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" and then show that she actually resigned.  *Green*, 136 S. Ct. at 1777; *see also Perkins*, 936 F.3d at 211-12; *Crockett v. SRA Int'l*, 943 F. Supp. 2d 565, 576 (D. Md. 2013); *Lopez v. BMA Corp.*, DKC-13-2406, 2013 WL 6844361 (D. Md. Dec. 24, 2013).

Regarding the "intolerability" of the work environment, the Fourth Circuit recently instructed in *Perkins*, 936 F. 3d at 211-12 (internal quotation marks and citations omitted):

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign.  Instead, intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign . . . that is, whether he would have had no choice but to resign.

19

The "frequency of the conditions at issue" is an important part of the intolerability assessment. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995)). "The more continuous the conduct, the more likely it will establish the required intolerability.  On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Evans*, 936 F.3d at 193.

To be sure, intolerability is a high bar.  Without more, "difficult or unpleasant working conditions and denial of management positions . . . are not so intolerable as to compel a reasonable person to resign." *Id.*; *see also Booz-Allen & Hamilton, Inc.*, 368 F.3d at 378 ("[M]ere 'dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'") (citation omitted).  Further, constructive discharge requires a greater showing than a claim of hostile work environment.  *See Evans*, 936 F.3d 183, 193; *see also Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 162 (4th Cir. 2018) ("The 'intolerability' standard governing constructive discharge claims is more stringent than the 'severe and pervasive' standard for hostile work environment claims.").

Although plaintiff bears the burden of proving its prima facie case, it can survive summary judgment as to the third element, adverse employment action, by identifying genuine issues of material fact with regard to Hadith's alleged constructive discharge.  *See, e.g.*, *Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th Cir. 2000) ("To support his claim of constructive discharge, Huskey was required to demonstrate that there were triable issues of fact as to whether a reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminatory working conditions."); *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th

20

Cir. 2000) (recognizing that triable issues of fact as to the constructive discharge claim would defeat summary judgment); *Crump v. Tcoombs & Assocs., LLC*, 2:13-cv-707, 2015 WL 5601885, at *28 (E.D. Va. Sept. 22, 2015) (same); *Johnson v. Woodruff*, 28 F. Supp. 2d 1248, 1251 (M.D. Fla. 1998) (same).

## 2.

In essence, Greyhound contends that Hadith was not, and could not have been, constructively discharged for three reasons: Hadith was not a Greyhound employee; she failed to engage with Greyhound in an attempt to arrive at a mutually acceptable accommodation; and, she did not experience intolerable working conditions.

As to the first contention, Greyhound asserts that, as of December 5, 2017, the date of Hadith's meeting with Remy in Atlantic City and her departure from the training program, Hadith "was still a Driver Student and not yet employed with Greyhound."  ECF 52-1 at 23.  Greyhound seems to suggest, then, that as a trainee, Hadith could not have been constructively discharged, as a matter of law.  But, defendant does not offer any legal argument in support of this view.  Moreover, while Greyhound claims, on the one hand, that Hadith was not an employee at the relevant time, Greyhound also asserts that Hadith "did not attempt to remain *on the job* while seeking redress,"  *id.* at 22 (emphasis added), and that she "chose . . . to *resign*" following her meeting with Remy on December 5, 2017.  ECF 56 at 13 (emphasis added).

Clearly, defendant does not express a consistent view as to whether Hadith's status as a trainee at the relevant time was more akin to that of an employee or an applicant for purposes of constructive discharge doctrine.  In any event, even if Hadith qualified only as an applicant, she was nonetheless entitled to be free of discrimination on the basis of religion in the hiring process. *See* 42 U.S.C. § 2000e-2(a)(1).  In *Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 770, the Supreme

Court said: "Title VII . . . prohibits a prospective employer from refusing to hire an applicant in order to avoid accommodating a religious practice that it could accommodate without undue hardship."

Greyhound's second contention as to why Hadith was not constructively discharged does not fare any better.  In *Consol Energy*, 860 F.3d at 146, the Fourth Circuit explained: "'Title VII requires an employer to provide a reasonable accommodation when *requested* by the employee,' not only after . . . a successful grievance process . . . ."  (Citation omitted).  Here, Hadith claims that she requested an accommodation during her initial interview with Remy on November 10, 2017, during multiple follow-up conversations, and at her meeting with Remy on December 5, 2017.  Moreover, to "'prove constructive discharge,'" Hadith was "'not required to endure an intolerable work environment' until a grievance process [could] be utilized and completed."  *Id.* (citation omitted).

In its reply, defendant attempts to distinguish *Consol Energy*, pointing out that the plaintiff in that case "had been engaging in the required interactive process with Consol for *two months* in an effort to work out a solution . . . ." ECF 56 at 12 (emphasis in original).  In contrast, according to defendant, Hadith "chose swiftly to resign" on the "day . . . she was offered a reasonable accommodation for her religious observances."  *Id.*

To be sure, Hadith promptly decided to depart the training program following her conversation with Remy on December 5, 2017.  But, according to Hadith, by that time she had already had several discussions with Remy throughout the prior month about the issue of religious accommodations.  And, she had received assurances that she would be permitted to wear an abaya while at the training program in Atlantic City and, it seems, as a Greyhound driver.  Yet, Hadith recalled that Remy's presentation of Greyhound's position at their December 5 meeting was blunt

and inflexible, something approximating an ultimatum: "'What are you going to do? Are you going to accept our terms?'" ECF 55-1 (Hadith Dep.) at 37 (Tr. at 170).  Contrary to Greyhound's view, Hadith's testimony indicates that defendant had ample time to clarify its policies, clear up any confusion with Hadith, and discuss proposed accommodations with her prior to the date of her alleged constructive discharge.

Greyhound's most substantial argument regarding constructive discharge is that Hadith's prospective working conditions were not (or would not have been) intolerable.  Defendant maintains that there "is no evidence that Ms. Hadith experienced any conditions beyond 'ordinary' discrimination."  ECF 52-1 at 22.  And, in its reply, defendant urges the Court not to consider Hadith's Declaration, at least to the extent that it pertains to the intolerability issue, because it constitutes a sham affidavit.  *See* ECF 56 at 3-4.

In her Declaration, Hadith avers, in relevant part, ECF 55-4 at 2-3:

8. During my deposition I was not asked about the spiritual consequences of wearing a form fitting skirt with a tucked in shirt over a pair of pants as was proposed by Jehu Remy.

9. My Islamic faith is the guiding principal [sic] of my life. It influences everything I do.

10. The Quran is the sacred scripture of the Muslim faith. It promises that people who follow God's law will attain paradise when they die.

11. Failing to follow Islamic teachings about modesty could lead me to lose the opportunity to attain paradise.

12. I believe that because of my build, wearing a form fitting skirt with a tucked in shirt would not satisfy the Islamic requirement of modesty because it would not conceal the curvature of my lower back and buttocks.

13. Islam teaches that it is the woman who bears responsibility when men look at her in a lustful way.

14. On December 5, 2017 when Remy proposed wearing a form fitting skirt with a tucked in shirt, I was married. The requirement of modesty is even more critical for

married women. A married woman who causes a man to lust has committed *zina,*
a sin which is nearly a form of adultery.

15. I did not agree to wear a form fitting skirt over pants as Remy proposed because
I believed that it would be a sin that could prevent me from attaining paradise.

Greyhound contends that these averments in Hadith's Declaration contradict her deposition

testimony and were manufactured to introduce triable issues.  In particular, defendant notes that

Hadith testified at her deposition that on occasion she would wear jeans with boots or sandals

while out with Boone.  *See* ECF 56 at 4-5.  Further, Greyhound argues, Hadith recalled that Boone

did not object to Greyhound's proposed accommodation.  *See id.*  And, defendant insists that

Hadith's testimony made no reference to the "spiritual consequences" of "accepting Greyhound's

accommodation." *Id.* at 5.

The Supreme Court has formulated the sham affidavit rule as follows: "[A] party cannot

create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his

or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that

party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the

disparity." *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999).  The Fourth

Circuit has since reaffirmed that a party "may not avoid summary judgment by submitting

contradictory evidence" with regard to earlier assertions.  *Williams v. Genex Services, LLC*, 809

F.3d 103, 110 (4th Cir. 2015).  Allowing a party to do so would "'greatly diminish the utility of

summary judgment as a procedure for screening out sham issues of fact.'"  *Id.* (quoting *Barwick*

*v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)).

Notably, "'[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.'" *Okoli v. City of*

*Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 255).  In order to

24

avoid infringing upon the province of the fact finder, application of the sham affidavit rule at the summary judgment stage must be carefully limited to situations involving flat contradictions of material fact; "minor inconsistencies . . . afford no basis for excluding an opposition affidavit." *Van Asdale v. Int'l Game Technology*, 577 F.3d 989, 998-99 (9th Cir. 2009) ("[T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.").

The gist of Greyhound's sham affidavit argument is that Hadith's Declaration conflicts with her deposition testimony regarding her husband's role as the decision-maker in matters concerning her attire. *See* ECF 56 at 4-5. To be sure, Hadith testified that, according to her religious beliefs, her husband was "responsible for [her] clothing." ECF 55-1 (Hadith Dep.) at 13 (Tr. at 50). And, when Hadith called Boone on December 5, 2017, he told her that the decision of whether to accept Greyhound's proposed accommodation was up to her, as noted. However, these elements of Hadith's testimony do not flatly contradict her Declaration. Rather, Hadith's testimony makes clear that she decided not to accept Greyhound's proposal in view of her religious beliefs, as well as those of Boone. It is beyond dispute that both Hadith and Boone are observant Sunni Muslims. *See, e.g.*, ECF 55-1 (Hadith Dep.) at 3-6 (Tr. at 14-18); ECF 55-2 (Boone Dep.) at 6 (Tr. at 36). Hadith's Declaration expands on her deposition testimony regarding her religious beliefs and those of Boone, which were essentially the same. But, she was not explicitly asked about these matters at her deposition. *See* ECF 55-4, ¶ 1. Accordingly, the sham affidavit doctrine does not foreclose consideration of Hadith's Declaration.

At a minimum, Hadith's averment that wearing a "form fitting skirt" would "prevent [her] from attaining paradise" creates a genuine issue of material fact regarding the intolerability of the prospective conditions of training and employment at Greyhound. ECF 55-4 at 3, ¶ 15; *see Consol*

*Energy*, 860 F.3d at 144-45 (concluding that employee's belief that a condition of employment would subject him to eternal damnation would give rise to intolerable working conditions).

Moreover, even without the Declaration, the EEOC has raised issues of fact regarding the conditions of Hadith's employment that are matters for the fact finder to consider.  Hadith believes that wearing an abaya is a "requirement" of her faith.  ECF 52-6 (Hadith Dep.) at 9 (Tr. at 32).  And, she testified that she would "never" have left her previous employment to pursue a job with Greyhound but for the assurances she received from Remy that she would be permitted to wear an abaya on the job.  *See* ECF 55-1 (Hadith Dep.) at 50 (Tr. at 190).  Moreover, defendant does not contest the sincerity or intensity of Hadith's faith, as noted.

Nevertheless, Greyhound insists that "an employee 'cannot establish the intolerability of working conditions under which she never worked.'"  ECF 52-1 at 23 (quoting *Yancey v. Nat'l Ctr. on Institutions & Alternatives*, 986 F. Supp. 945, 954 n.10 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998)).  According to defendant, the notion that wearing the uniform proposed by Greyhound would have been intolerable to Hadith was "speculation."  *Id.*  Yet, Hadith claims that, in no uncertain terms, Remy told her how she would have to dress on the job.  Given the sincerity of Hadith's faith, the conflict between the prospective conditions of employment and her religious belief was stark.

Therefore, I conclude that the EEOC has established a prima facie case that defendant failed to reasonably accommodate Hadith's religious beliefs.  And, the EEOC has presented triable issues with respect to Hadith's constructive discharge.

### C.  Reasonable Accommodation & Undue Burden

As mentioned, once an employee establishes a prima facie case, the "the burden then shifts to the employer . . . ."  *Chalmers*, 101 F.3d at 1019.  To satisfy its burden and prevail on summary

judgment, the employer must demonstrate either that it offered a reasonable accommodation or that doing so would have caused an undue hardship. *Firestone*, 515 F.3d at 312. Greyhound argues that the accommodation offered to Hadith on December 5, 2017, was reasonable, and that Hadith's preferred accommodation would have caused Greyhound an undue burden. ECF 52-1 at 23-24, 26. I address each argument, in turn.

### 1.

The reasonableness analysis in contexts such as this one is fact specific. *See Tabura*, 880 F.3d at 558; *Beadle*, 29 F.3d at 592. The analysis focuses on "the extent of the employee's religious obligations and the nature of the employer's work requirements." *Firestone*, 515 F.3d at 313. "Ordinarily, questions of reasonableness are best left to the fact finder." *E.E.O.C. v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990) (addressing reasonableness in the context of a Title VII religious accommodation claim).

First, Greyhound contends that the accommodation offered to Hadith was reasonable because another Greyhound driver, a Muslim woman, had previously accepted a similar offer. *See* ECF 52-1 at 24. In April 2015, that employee requested permission to wear an angle-length skirt on the job, in accordance with her religious beliefs. ECF 52-5 at 38. Norman testified that he was partially responsible for handling that driver's request, as he was with Hadith. *See* ECF 52-5 (Norman Dep.) at 17, 19 (Tr. at 47, 49). And, in that situation, Norman and other Greyhound officials were concerned about the safety risks that an ankle-length skirt might pose. *See id.* Greyhound offered the driver leave to wear a skirt that fell no more than five inches below the knee and over the pants of the driver's uniform. *Id.* at 18 (Tr. at 48). The driver accepted Greyhound's offer. *See id.* at 20 (Tr. at 50). As of the time of Norman's deposition in June 2020, the individual remained employed by Greyhound. *See id.*

27

This single data point does not resolve the inquiry here.  The evidence submitted contains virtually no information about the other driver, including her religious background, practices, and beliefs.   Greyhound would like to think that the other Muslim driver and Hadith are interchangeable for purposes of Title VII.  But, two members of the same religion may have varying religious practices and forms of religious observation, especially with respect to details such as the length of a skirt or overgarment.[6]

Moreover, Greyhound's attempt to anchor the reasonableness analysis to its experience with one other Muslim driver is a tack that other courts have rejected.  In *GEO Grp.*, 616 F.3d 265, the EEOC alleged that an employer failed to provide reasonable accommodations to "Muslim women employees . . . by providing them an exception to the . . . dress policy that otherwise precluded them from wearing Muslim head coverings called khimars at work."  *Id.* at 267.  The employer offered the employees the option of wearing a surrogate "hairpiece" in place of a khimar. *See id.* at 269, 271.  One "female Muslim employee found that a hairpiece was sufficient to fulfill the religious requirement to cover her hair."  *Id.* at 271.  However, the Third Circuit rejected the employer's argument that the decision of that single employee determined whether the proposed accommodation was reasonable as to the others, reasoning: "There is no evidence about the proposed hairpiece nor any details about the Muslim employee who found it acceptable.  We are unwilling to delve into any matters of theology . . . .   [The employer] does not challenge the assertion of the three Muslim employees that they believe wearing the khimar is integral to their

---

[6] By analogy, although "'Conservative and Orthodox Jews generally agree on the standards'" of the Jewish dietary laws known as "kashrut,'" they "'differ in their interpretations of specific provisions.'"  *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1340 n.3 (4th Cir. 1995) (citation omitted).

religion, and we proceed on the basis that this is their sincere religious belief." *Id.* That rationale is equally applicable here.

Greyhound's other arguments fall flat. For instance, it asserts in its reply that "there is no dispute that what was offered by Greyhound met [Hadith's] religious beliefs (to maintain modesty) and directly addressed the religious conflict." ECF 56 at 15 n.14. Of course, simply asserting that "there is no dispute" does not make it so. It is abundantly clear that Hadith was of the view that Greyhound's offer was unacceptable to her on religious grounds. She first countered Greyhound's offer by proposing to wear an untucked shirt required by the Greyhound uniform over her abaya. ECF 55-1 (Hadith Dep.) at 36 (Tr. at 169). After Remy rejected that proposal, Hadith then proposed wearing an untucked shirt with an ankle-length skirt. *Id.* That, too, was rejected. As noted, it is unclear whether Greyhound objected to the proposal of an untucked shirt, in addition to that of an abaya or an ankle-length skirt.

Sifting between the disputed facts pertinent to this claim is the province of the jury. Similarly, whether Greyhound's proposal and its rejection of Hadith's counter-offers were reasonable is a matter for the jury.

Moreover, that Hadith attempted to negotiate with Remy during their meeting on December 5, 2017, belies defendant's contention that Hadith's claim fails because she did not sufficiently "'cooperate" and was not "'flexible." ECF 52-1 at 25 (quoting *Bruff v. N. Mississippi Health Servs., Inc.*, 244 F.3d 495, 503 (5th Cir. 2001)). In any event, the Fourth Circuit has cautioned against "improperly plac[ing] the burden on the employee to be reasonable rather than on the employer to attempt accommodation." *EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116, 118 (4th Cir. 1988), *cert. denied*, 488 U.S. 924 (1988).

**2.**

Greyhound contends that it is also entitled to summary judgment because Hadith's preferred accommodation would have created an undue burden for Greyhound.  As Greyhound points out, safety risks and related legal risks are important considerations in the undue burden inquiry.  *See* ECF 52-1 at 27 (collecting cases).  And, as indicated, safety concerns allegedly animated Greyhound's conduct here.

The EEOC retained an expert, Carl Berkowitz, Ph.D., to opine "on clothing and bus safety."  ECF 55 at 15.  He a professional engineer with a doctorate in "Transportation Planning and Engineering."  ECF 55-7 at 81; *see id.* at 50, 80.  According to the report that Dr. Berkowitz produced (ECF 55-7 at 49-118, the "Report"), he has worked as a consultant since 1988.  *Id.* at 81. Prior to 1988, Dr. Berkowitz held various positions with the New York State Department of Transportation, among other government agencies.  *Id.*  In particular, Dr. Berkowitz testified that he "operat[ed] a New York City bus for a couple of years," and later served as "the general manager of one of New York City's bus systems."  ECF 55-7 (Berkowitz Dep.) at 39 (Tr. at 171).

Notably, Dr. Berkowitz also has experience designing bus transportation systems and standards in Dubai, a large city located in the United Arab Emirates.  *See* ECF 55-7 at 66-67; *see also United Arab Emirates*, The World Factbook, https://www.cia.gov/the-world-factbook/countries/united-arab-emirates/ (last updated July 29, 2021).[7]  In his Report, Dr. Berkowitz explained, ECF 55-7 at 66-67:

> For several years, I worked as a consulting engineer for the Road and Transportation Authority in Dubai, the largest city in the UAE. The UEA is a majority Muslim country where women are permitted to drive, and women routinely wear abayas. I, and a team of engineers, established safety standards for the operation of school buses in Dubai. Dubai school buses can be busses of the type used by American schools or motorcoaches of the type Greyhound uses.

---

[7] Fed. R. Evid. 201 permits courts to take judicial notice of adjudicative facts.

30

Women are eligible to work as school bus drivers in Dubai. We set out all training, licensing, and safety requirements for school bus drivers, but did not establish any regulation or restriction on religious clothing, including abayas.

We performed a comprehensive study of all school bus operational safety risks. If the abaya was a safety hazard it would have come to our attention when we looked at all potential safety hazards. We saw no evidence that an abaya posed a safety hazard.

Both sides agree that Dr. Berkowitz's opinion is based in part on video recordings of Hadith entering and exiting a Greyhound bus and "operating the pedals of a stationary Greyhound bus." ECF 55 at 16; *see* ECF 52-1 at 17.   The Report contains photographs extracted from those recordings.   ECF 55-7 at 57-59.   But, the recordings themselves have not been made available to the Court.   Ultimately, Dr. Berkowitz concluded, *inter alia*, that wearing an abaya as a Greyhound bus driver "does not impact safety; does not interfere with the pre-trip inspection; does not interfere with passenger recognition when suitable accessories such as safety vest, hat or badge are provided; and does not violate any applicable laws, regulations or standards." *Id.* at 78.

On September 9, 2020, Greyhound moved to strike Dr. Berkowtiz's Report and testimony on reliability grounds, pursuant to Fed. R. Civ. P. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).   ECF 44.   I held a telephone conference with counsel on September 15, 2020. *See* Docket.   That day, I issued an Order (ECF 49) denying defendant's *Daubert* motion for the reasons stated during the telephone conference, without prejudice to defendant's right to refile the motion at a later time.   But, defendant did not subsequently renew the argument.   And, in its Motion, Greyhound does not raise concerns regarding the admissibility of Dr. Berkowitz's opinion evidence.   *See* ECF 52-1 at 26-31.

However, Greyhound again invokes *Daubert* and Rule 702 in its reply, urging the Court not to consider Dr. Berkowitz's opinions.   *See* ECF 56 at 8-9.   Whatever merit there might be to Greyhound's argument is of no moment here, given the manner in which Greyhound has presented

it.  When "contentions appear for the first time in [a] reply brief, the court is inclined not to consider them."  *Humane Soc'y of the United States v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, DKC-13-1822, 2016 WL 3668028, at *4 (D. Md. July 11, 2016); *see Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").  Moreover, the criticisms that Greyhound lodges of Dr. Berkowitz's evidence at this stage go to weight, which is the province of the jury, and not to admissibility.  *See* ECF 56 at 6- *Anderson*, 477 U.S. at 249; *Guessous*, 828 F.3d at 216.

Some of Greyhound's criticisms appear to conflict with portions of the evidence.  For instance, defendant repeatedly states that Dr. Berkowitz conceded that Hadith could not maintain "three-points of contact" with a Greyhound bus during her ascent and descent while wearing an abaya because she had to use her hands to lift the bottom of the abaya.  ECF 52-1 at 17; *see id.* at 30; ECF 56 at 18 n.21.  As Dr. Berkowitz explained at his deposition, "OSHA recommends that for safe walking on stairs or [a] walkway . . . you should have three points of contact, either two feet and one hand or two hands and one foot."  ECF 55-7 (Berkowitz Dep.) at 18 (Tr. at 83).[8] However, as the EEOC points out, Dr. Berkowitz also testified that during Hadith's simulation ascending and descending a Greyhound bus, Hadith "maintain[ed] four points of contact" while using her hands to lift the abaya.  ECF 55-7 (Berkowitz Dep.) at 19 (Tr. at 84).

In any event, the undue burden analysis here does not rise or fall on Hadith's performance in an abaya.  She made clear her willingness to wear an ankle-length skirt on the job, to no avail.

---

[8] "OSHA" refers to the Occupational Safety and Health Administration within the Department of Labor.  *See Occupational Safety and Health Administration*, United States Department of Labor, https://www.osha.gov/ (last visited Aug. 10, 2021).

Dr. Berkowitz also observed that Hadith's "driving record as it was submitted to Greyhound indicates that she has an exemplary driver record."  ECF 55-7 at 56.  This observation aligns with the evidence of Hadith's performance as a professional truck driver.  As discussed, Hadith asserts in her Declaration that she has "driven a semi-truck at least 800,000 miles on U.S. highways while wearing an abaya" and that she has never "been in an accident."  ECF 55-4 at 1, ¶¶ 6-7.  Nor has wearing an abaya ever interfered with driving a truck, entering and exiting a truck, or inspecting a truck, according to Hadith.  *Id.*  Similarly, Boone testified that in his experience driving a truck with Hadith, accumulating more than 50,000 miles on the road together, he never observed Hadith's abaya interfere with her ability to operate, inspect, board, or exit a truck.  *See* ECF 55-2 (Boone Dep.) at 22-24 (Tr. at 115-17).

Notably, Greyhound has not offered any expert evidence of its own, or for that matter, any evidence whatsoever, regarding the safety risk posed by Hadith's religious attire.  Nor does Greyhound identify any undue burden that would have resulted from Hadith wearing an untucked shirt, which was also part of her requested accommodation.  Certainly, Title VII permits employers to prioritize the safety of their employees and customers, and in Greyhound's case, of other drivers and passengers on the road.  *See, e.g.*, *GEO Grp.*, 616 F.3d at 273 ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship . . . ."); *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745, 758 (E.D.N.Y. 1998) ("Where . . . the proposed accommodation threatens to compromise safety in the workplace, the employer's burden of establishing an undue burden is light indeed."), *aff'd*, 189 F.3d 461 (2d Cir. 1999).  But, on this record, the Court cannot conclude, as a matter of fact or law, that Hadith's requested accommodation would have resulted in a safety risk or an undue burden on Greyhound.  Rather, the evidence creates triable issues of fact as to whether Hadith's preferred accommodation would

have caused a legitimate safety issue or imposed more than "a *de minimis* cost" on Greyhound.

*Hardison*, 432 U.S. at 84.

## IV.  Conclusion

For the foregoing reasons, I shall deny Greyhound's Motion.  ECF 52.

An Order follows.

Date: August 12, 2021                                         _____/s/_____

                                                             Ellen L. Hollander
                                                             United States District Judge